1

2                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
3                          EASTERN DIVISION

4   UNITED STATES OF AMERICA,

5            Plaintiff,             Case No. 5:24MJ1209
                                    Akron, Ohio
6            vs.                    Friday, September 6, 2024
                                    11:34 a.m.
7   MICHAEL MONROE JAMES,

8            Defendant.

9

10            TRANSCRIPT OF DETENTION HEARING
         BEFORE THE HONORABLE AMANDA M. KNAPP
11           UNITED STATES MAGISTRATE JUDGE

12

    APPEARANCES:
13

    For the Government:   Toni B. Schnellinger Feisthamel
14                        Office of the U.S. Attorney - Akron
                          2 South Main Street, Room 208
15                        Akron, Ohio 44308
                          (330) 375-5716
16

    For the Defendant:    Edward G. Bryan
17                        Office of the Federal Public Defender
                          Skylight Office Tower, Suite 750
18                        1660 West Second Street
                          Cleveland, Ohio 44113
19                        (216) 522-4856

20  Court Reporter:       Caroline Mahnke, RMR, CRR, CRC
                          Federal Building & U.S. Courthouse
21                        2 South Main Street, Suite 568
                          Akron, Ohio 44308
22                        (330) 252-6021

23

24  Electronic recording transcribed by mechanical stenography
    from a digital audio recording; transcript produced by
25  computer-aided transcription.

1      Friday, September 6, 2024

2           THE DEPUTY CLERK:  All rise.  This Honorable

3   United States Court for the Northern District of Ohio is now

4   open for the transaction of business, the Honorable Amanda

5   M. Knapp presiding.

6           Please be seated.

7           Your Honor, the case before the Court carries Case

8   Number 5:24MJ1209, United States of America versus Michael

9   Monroe James.

10           THE COURT:  All right.  Good morning, everyone.

11           Can I have appearances, please, from counsel.

12           MS. SCHNELLINGER:  Good morning, Your Honor.

13   Toni Beth Schnellinger for the United States.  I'm joined at

14   counsel table by Austin Johnston, special agent with the

15   FBI.

16           THE COURT:  Good morning, Special Agent Johnston.

17           MR. BRYAN:  Good morning, Your Honor.  Edward

18   Bryan on behalf of Michael James.

19           THE COURT:  All right.  And I see Mr. James

20   there.

21           Good morning, sir.

22           THE DEFENDANT:  Good morning, Your Honor.

23           THE COURT:  And we also have Pretrial Services

24   Officer Motley.

25           Good morning, Officer Motley.

1      THE PRETRIAL SERVICES OFFICER:  Good morning,

2  Your Honor.

3      THE COURT:  All right.  Mr. James, you're here

4  for a scheduled detention hearing pursuant to 18 U.S.C. 3142

5  on the government's motion for detention.

6      The issue before the Court is whether there is a

7  condition or combination of conditions that will reasonably

8  assure the safety of others and the community and your

9  appearance in the case.

10     Ms. Schnellinger, I believe you indicated at the last

11  proceeding that this is a matter to which the Crime Victims'

12  Rights Act occurs.

13     Is that correct?

14         MS. SCHNELLINGER:  Yes, Your Honor.

15         THE COURT:  And has the government fulfilled its

16  duty of notification to the extent possible?

17         MS. SCHNELLINGER:  At this time, yes.  We're

18  still continuing that process.

19         THE COURT:  Thank you.

20     Mr. James, as I indicated at your prior appearance,

21  you are entitled to be represented by counsel at every stage

22  of these proceedings.

23     The Court has previously appointed the federal public

24  defender to represent you in this case.

25     Do you understand Mr. Bryan is representing you as

1    your attorney today?

2                THE DEFENDANT:  Yes, Your Honor.

3                THE COURT:  Have both parties had an adequate

4    opportunity to prepare for today's proceedings?

5                MS. SCHNELLINGER:  Yes, Your Honor.

6                MR. BRYAN:  We have, Your Honor.

7                THE COURT:  And have both parties received the

8    pretrial services report?

9                MS. SCHNELLINGER:  Yes, Your Honor.

10               MR. BRYAN:  Yes.

11               THE COURT:  Ms. Schnellinger, it appears to the

12   Court that a statutory presumption of detention does exist

13   in this case under 18 U.S.C. 3142.

14        Does the government concur?

15               MS. SCHNELLINGER:  Yes, Your Honor.

16               THE COURT:  Mr. Bryan, does the defense concur

17   this is a presumption case?

18               MR. BRYAN:  We do, Your Honor.

19               THE COURT:  Mr. James, due to the nature of the

20   charges in this case, Congress has established a presumption

21   under 18 U.S.C. 3142(e)(3) that no condition or combination

22   of conditions will reasonably assure the appearance of the

23   person as required and the safety of the community.  That

24   presumption is subject to rebuttal by you.

25        While you have a burden of production to rebut the

1  presumption, the government retains the overall burden of

2  persuasion on the issue of detention.

3      At no time does the presumption in favor of detention

4  impact the presumption of innocence that applies in all

5  criminal cases.

6      I'm going to summarize now the procedure that we will

7  follow today.

8      Mr. James, at this hearing you will have the right to

9  cross-examine witnesses, if witnesses are presented, and to

10 present evidence through your counsel.

11     You also have the right to testify but are not

12 required to do so.  You have the right to remain silent.

13     You have the right to consult with your attorney at

14 any time during these proceedings.

15     The rules of evidence, other than with respect to

16 privileges, do not apply.

17     Hearsay evidence is admissible.

18     And both sides have the right to proceed in whole or

19 in part by way of proffer.

20     The evidence and examinations will be limited solely

21 to the detention determination.  The hearing is not to be

22 used to obtain discovery or produce testimony for subsequent

23 impeachment at trial.

24     I will not consider motions to suppress evidence or

25 objections to evidence allegedly obtained unlawfully.

1          The government will proceed first today with its

2     evidentiary presentation or proffer.

3          After that, the defense will have an opportunity to

4     present evidence or proffer.

5          I will allow rebuttal evidence as appropriate.

6          After all of the evidentiary presentations are

7     complete, that is when I will hear argument first from the

8     government and then from the defense.

9          Ms. Schnellinger, are you prepared to proceed?

10          MS. SCHNELLINGER:  Yes, Your Honor.

11          Your Honor, the United States would proffer the

12     affidavit in support of the criminal complaint.

13          We've also provided the Court and defense counsel

14     Government's Exhibit 1 which is a report of investigation.

15     We would proffer that.

16          We would also proffer the pretrial services report,

17     and we would point out that, as reflected on page 5 of the

18     report, that the pretrial risk assessment doesn't accurately

19     assess the defendant population involved in sex offenses.

20     We would point that out, Your Honor, and also the fact that,

21     in the last page, how the pretrial sentence report doesn't

22     reflect the weight of the evidence or rebuttable

23     presumptions.

24          Your Honor, we would call Special Agent Johnston to

25     the stand.

1      THE COURT:  All right.  Special Agent Johnston,

2  would you please come over here to the witness stand.

3                  AUSTIN JOHNSTON,

4      of lawful age, a witness called by the government,

5        being first duly placed under oath, was examined

6                 and testified as follows:

7            THE COURT:  You may inquire.

8            MS. SCHNELLINGER:  Thank you, Your Honor.

9          DIRECT EXAMINATION OF AUSTIN JOHNSTON

10  BY MS. SCHNELLINGER:

11  Q.    Sir, can you please state your name for the record.

12  A.    Austin Johnston.

13  Q.    By whom are you employed?

14  A.    The Federal Bureau of Investigation.

15  Q.    Where are you currently assigned?

16  A.    The Canton resident agency.

17  Q.    And what are your duties and responsibilities?

18  A.    To enforce federal violations, specifically those that

19  relate to violent crime and crimes against children.

20  Q.    And were you involved in the investigation of a

21  Michael Monroe James?

22  A.    I was.

23  Q.    What was your role in the investigation?

24  A.    It was shared with a task force officer that we have.

25  Ultimately our role was to make contact with Mr. James and

1    inquire about an interaction that he had online.

2    Q.    This interaction that you reference that he had

3    online, can you describe what that was?

4    A.    An OCE, which stands for an online covert employee,

5    that we have at the Federal Bureau of Investigation started

6    a chat on an application called Whisper, which is an

7    anonymous chat application which enables you to post

8    pictures, comments, essentially anonymously.

9    That covert employee had made a post, and Mr. James

10    had responded to that post.

11    Q.    And what was the nature of the conversation?

12    A.    The initial post stated something along the lines of

13    "My parents are going to kill me when they find out that I'm

14    pregnant."

15    That was the initial post made by the OCE.

16    And then that conversation was initiated by Mr. James

17    asking that OCE how old they were.

18    Q.    And how old did the online covert employee reference

19    that they were?

20    A.    Eleven years old.

21    Q.    And did the conversation with this alleged eleven year

22    old continue?

23    A.    It did.

24    Q.    What was the nature of the conversation?

25    A.    It was primarily driven by Mr. James. His initial

1   response to the covert employee stating that they were

2   eleven was, "Really?  That's odd that you're pregnant.  Who

3   is the dad?"

4        Mr. James later sent a photo which was later

5   identified as Mr. James.  He was wearing a Taco Bell shirt.

6   And Mr. James was employed at Taco Bell.

7        Throughout the conversation, which was mainly driven

8   by Mr. James and little communication was made by the OCE,

9   Mr. James stated, "My dick is going to hurt you, but you

10  will love it in the end."

11       References getting the OCE pregnant and that "When

12  that child is born, when she turns six she will start to get

13  used like I use you."

14       Mr. James asked for the OCE's address so that he could

15  plan a trip.

16       Mr. James stated, "If you pass out, then I'll go

17  rougher.  You'll beg me to stop, and I'll shove my dick down

18  your throat until you can't breathe."

19  Q.   This was all through the OCE who he believed was

20  eleven years old?

21  A.   That's correct.

22  Q.   And is this entire conversation reflected in

23  Government's Exhibit 1?

24  A.   It is.

25  Q.   Did he send any other pictures besides the picture of

1     himself?

2     A.    He did.  He sent a photo of an erect male penis.

3     Q.    And did he make arrangements to meet with this eleven

4     year old?

5     A.    Attempted.

6     Q.    Did that ever occur?

7     A.    Not that we're aware of.

8     Q.    After -- where was this eleven year old supposedly

9     supposed to be located?

10     A.    In Ohio.  Toledo.

11     I don't -- she -- from my recollection, the specific

12     location was never stated.

13     Q.    And did your office receive this information?

14     A.    We did, yeah.  The OCE stopped communicating with Mr.

15     James and then forwarded the communication thread on to our

16     AOR.

17     Q.    And what's an AOR?

18     A.    Area of responsibility.

19     Q.    And why was that?  Why did your office get this

20     report?

21     A.    The OCE had determined the location based upon a

22     subpoena.  That subpoena came back to Massillon Cable which

23     was the internet provider for the household that the IP came

24     back to which was listed for David and Heather James which

25     are Mr. James's parents.

1  Q.    And the photo of the individual's face, did that match

2  who you believed to be Mr. James?

3  A.    Correct.

4  Q.    Then what happened once your office received the

5  report?

6  A.    Just based upon the report, we went out and made

7  contact with Mr. James at his residence, told Mr. James that

8  we had received a tip of information related to his online

9  use, engaged with a brief interview of Mr. James.

10        He provided consent for us to search his mobile device

11  and stated that he was using applications consistent with

12  the OCE report.

13  Q.    He was using the applications.  Did he admit anything

14  else on that occasion?

15  A.    He did admit that he had talked to minors.

16  Q.    Did he say how many?

17  A.    At that time I don't recall how many he had spoken to.

18  Q.    And you stated that you received consent to search his

19  phone?

20  A.    That's correct.

21  Q.    And your office then proceeded to do that?

22  A.    We did.

23  Q.    What was found on the his cellular phone?

24  A.    The report was done towards the end of July of this

25  year.  We located 764 files of CSAM which was a mixture of

1  both photos and videos.

2  Q.     What is CSAM?

3  A.     Child sexual abuse material.

4  Q.     And can you give the specifics of the CSAM found on

5  the phone?

6  A.     Sure.  Three of the files that we detailed, one of

7  which was a color image that depicted an adult male engaged

8  in genital-to-genital sexual contact with a nude infant

9  female.

10      The second one was a color image that depicted an

11  adult male engaged in genital-to-genital sexual contact with

12  a nude prepubescent female.  That image showed the female,

13  although it was an image, appeared to be screaming with her

14  mouth open and eyes wincing.

15      And then the third one that we reviewed -- or excuse

16  me, detailed, was another color image that depicted an adult

17  male engaged in genital-to-genital sexual intercourse with a

18  nude prepubescent male who had a blindfold on.

19  Q.     And based on your understanding of the investigation,

20  are the other 764 images and videos consistent with what you

21  just described?

22  A.     They were.

23  Q.     After your office had an opportunity to review

24  everything found on the phone, what happened next?

25  A.     We conducted a search warrant -- excuse me.  We did

1   not conduct a search warrant.

2       We received a warrant for Mr. James's arrest and

3   served that warrant.

4   Q.   What happened next?

5   A.   Subsequent to the arrest, we conducted another

6   interview of Mr. James at our office in Canton.

7   Q.   What did Mr. James tell you on that occasion?

8   A.   Mr. James stated that he had in fact been

9   communicating with minors previously for about the past two

10  years.  Between that time span, he had coordinated to meet

11  up with between two to ten minors but stated that he had

12  never actually done so.

13      And approximately ten times he had sent nude images of

14  himself to those minors.

15  Q.   Did he talk about any of the photos that were found on

16  his phone in reference to McDonald's?

17  A.   He did.  We, during the review of his phone, we had

18  located some photos of what appeared to be McDonald's

19  employees.

20      When we questioned Mr. James about that, he stated

21  that they were in fact McDonald's employees that he worked

22  with, and was using an AI generator to remove the clothing

23  and make them appear as if they were nude.

24  Q.   And these were female minors that worked at

25  McDonald's; is that correct?

1    A.    That's correct.

2    Q.    Did he state why he was doing that?

3    A.    For his own pleasure.

4    Q.    What do you mean by pleasure?

5    A.    I would just speculate that it was for sexual

6    gratification.

7                 MR. BRYAN:  Objection.

8                 THE COURT:  Yeah, sustained.

9    BY MS. SCHNELLINGER:

10   Q.    Did he describe anything regarding the individuals

11   that he targeted?  Did he have a specific type that he

12   targeted?

13   A.    He did.  He said that he prefers as young as eight

14   years old.

15   Q.    So eight was his limit?

16   A.    Correct.

17   Q.    You stated that he sent explicit photos of himself.

18   Did he state that he asked for photos back?

19   A.    On occasions.

20   Q.    And did he receive any of those photos?

21   A.    I don't recall.

22   Q.    Did he talk about the child sexual abuse materials

23   found on his phone at all?

24   A.    Briefly.  We -- the question was posed to Mr. James

25   based upon the what I would define as elevated conversation

1    that he was having which started kind of vanilla and then

2    became more aggressive in his communications with the

3    individuals in the chats.

4         We asked Mr. James if he had continued to communicate

5    with the minors online, if he would have ended up traveling

6    to meet with any minors, for which he stated that had we not

7    come and talked to him, he probably would have escalated to

8    hands-on offenses?

9    Q.   Did he tell you where he got the child sex abuse

10   materials?

11   A.   He mentioned a few different platforms, one of which

12   was Whisper.  The other one was Telegram.

13        He would go onto these platforms and specifically seek

14   out what are referred to as MEGA links.  Those links

15   contained CSAM, and would obtain it that way, but stated

16   that he never distributed any.  He would just purchase it

17   via CashApp and just would keep it for himself.

18   Q.   And when you stated some of the images that you

19   reviewed, or you and your agency reviewed, were infants,

20   what does infants mean to you?

21   A.   Generally I think that that would vary depending on

22   who the reviewer is, but one or less.

23   Q.   And some of the photos and videos that were on his

24   phone included infants?

25   A.   Correct.

1    Q.    And where did you -- where was he living when you

2    found him?

3    A.    He was living in his parents' residence.

4    Q.    And this is the same IP address that came back to his

5    parents?

6    A.    That's correct.

7              MS. SCHNELLINGER:  Your Honor, I have nothing

8    further for this witness.

9              THE COURT:  Cross-examination, Mr. Bryan.

10             MR. BRYAN:  Thank you, Your Honor.

11             CROSS-EXAMINATION OF AUSTIN JOHNSTON

12   BY MR. BRYAN:

13   Q.    Good morning, still, Special Agent Johnston.

14   A.    Good morning.

15   Q.    You were part of this Child Exploitation Task Force?

16   A.    I'm not listed under the Child Exploitation Task

17   Force.  I assist them.  I'm listed with the Violent Crimes

18   Safe Streets Task Force.

19   Q.    Okay.  So you're on the Safe Streets Task Force, but

20   you will assist in these child exploitation cases?

21   A.    Correct.

22   Q.    And how long have you been with the FBI?

23   A.    Approximately five years.

24   Q.    Okay.  And have you been doing that for that period of

25   time?

1    A.    I have.

2    Q.    So you've been doing safe violent streets and

3    assisting in child exploitation cases?

4    A.    Correct.

5    Q.    So you've been involved in investigations

6    where -- either you've personally been involved in or you've

7    heard of investigations where persons have contacted minors

8    online and did in fact meet up with the minors, correct?

9    A.    Correct.

10   Q.    Are you familiar with those cases?

11   A.    I am.

12   Q.    That didn't happen in this case, correct?

13   A.    Not that I'm aware.

14   Q.    Not that you're aware.

15         Your first knowledge of this I guess it was somebody

16   calling themselves Ambient_Sun on the Whisper app was on

17   June 13, 2024, correct?

18   A.    Correct.

19   Q.    And that's when an undercover task force officer -- I

20   don't know if it was FBI or a local officer acting in an

21   undercover capacity -- posted online that they were so much

22   in trouble because their parents, when they found out that

23   she was pregnant?

24   A.    Correct.

25   Q.    So that person was not an actual minor, correct?

1    A.    Correct.

2    Q.    It was an adult law enforcement officer pretending to

3    be a minor?

4    A.    Correct.

5    Q.    On this app that is known to be visited by persons who

6    are interested in minors?

7    A.    I'm not familiar with the extent of the Whisper app.

8    But yes, the OCE is not a eleven-year-old female.

9    Q.    Okay.  The OCE is an adult.  I think it says in the

10   affidavit a male, right?

11   A.    Correct, yeah.  He is a special agent out of Toledo,

12   Ohio.

13   Q.    So an FBI agent from Toledo, Ohio?

14   A.    Correct.

15   Q.    And so we've seen Government's Exhibit 1.  It's been

16   proffered to the Court.

17         And it's basically a chat between Ambient_Sun and this

18   person posing to be an eleven-year-old girl; correct?

19   A.    Correct.

20   Q.    It begins with the -- well, strike that.

21         This isn't the entire chat, correct?

22   A.    My belief is that this is the entire chat.

23   Q.    Okay.  Do you know if all of the statements made by

24   the OCE are included in this FBI 302?

25   A.    By statements, do you mean messages in response to Mr.

1   James?

2   Q.   Well, there are "OCE" and then there are "Subject."   I

3   assume that the OCE is the FBI agent, correct?

4   A.   That's correct.

5   Q.   And the Subject at the time was a person that was only

6   identified as Ambient_Sun, correct?

7   A.   At the time, correct.

8   Q.   Later to be identified as Mr. James, correct?

9   A.   Correct.

10  Q.   So that person -- it basically begins with that

11  person -- I guess the summary says that they went on and

12  said, "Oh, my God.  My parents are going to kill me when

13  they find out I'm pregnant."

14      Then shortly after that, Ambient_Sun -- well, it says

15  "Subject:  How old are you?"  So that would be Ambient_Sun,

16  correct?

17  A.   That's correct.

18  Q.   And then the OCE said, "Eleven"?

19  A.   Correct.

20  Q.   And then it goes on and it talks about having sex with

21  the eleven year old and having painful sex with the eleven

22  year old and all those other things, correct?

23  A.   Correct.

24  Q.   And only rarely are there interactions -- or

25  statements made by the OCE, correct?

1  A.    Correct.

2  Q.    And then there is a lot of dot, dot, dot, dot, dot;

3  correct?

4  A.    Correct.

5  Q.    Do you know if those are statements that were made by

6  the OCE that aren't part of Exhibit 1?

7  A.    I don't know.

8  Q.    Okay.  So is it possible that there are other

9  statements in the chat that aren't -- that weren't made

10  as -- that aren't on Government's Exhibit 1?

11  A.    That's possible.

12  Q.    Okay.  Because it seems like most of the statements

13  are made by the subject, right?

14  A.    Correct.

15  Q.    And I think the OCE only on one occasion says -- on a

16  couple of occasions says, "OMG."

17        One time says, "Will it hurt?"

18        "OMG, it will hurt."

19        You know, that kind of thing.

20        But we don't know exactly what the OCE is saying

21  on other occasions or if the OCE is saying anything else,

22  correct?

23  A.    Correct.

24  Q.    Now, you're aware of undercover investigations that

25  have actually continued to maintain their undercover

1    capacity where they then set up a meeting with the targeted

2    individual, correct?

3    A.    Correct.

4    Q.    And that wasn't done in this case, correct?

5    A.    That's correct.

6    Q.    So it wouldn't have been uncommon for law enforcement

7    to continue to maintain online communication with the target

8    to the point where they actually gave the target an address

9    to meet them at; correct?

10   A.    Sometimes.

11   Q.    But you've seen that happen?

12   A.    I have seen that.

13   Q.    Okay.  That's done in some instances to make sure that

14   people aren't just goofing off online, correct?

15   A.    I can't -- that would be an assumption.

16   Q.    Well, that they really mean it, rather than -- have

17   you heard of fantasy role-play?

18   A.    I have.

19   Q.    So sometimes people go online and they pretend to be

20   something that they're really not?

21   A.    Um-hum.

22   Q.    And they engage in activity online and say a lot of

23   very offensive things online, but they never actually do

24   anything?

25   A.    I've heard of that.

1    Q.    And sometimes they may even do it for masturbatory

2    reasons or things like that?

3    A.    I'm not familiar with it.

4    Q.    But to determine whether or not someone's really

5    interested in hooking up with an eleven year old and effing

6    their brains out, you would actually have to set up a sting

7    operation where you see if that person shows up at a

8    residence or at an address that they think they're going to

9    meet the eleven year old at, correct?

10   A.    Correct.

11   Q.    Okay.  And that wasn't done in this case, correct?

12   A.    Correct.

13   Q.    So we don't know whether or not the person, the

14   subject, was just engaging in what I would call fantasy

15   role-play as compared to really trying to groom somebody to

16   target them in sexual offenses, right?

17   A.    I can't say.

18   Q.    You can't say.

19         But it is concerning enough that you did -- they asked

20   you, since you were in the Canton area, to go out and, once

21   they located the IP address for where this person was

22   communicating, to contact that person or at least to locate

23   that person?

24   A.    Correct.

25   Q.    And that was done on July 1, I believe?

1    A.    I believe so.

2    Q.    And that's what the affidavit says, I believe?

3    A.    Yes.

4    Q.    And you were present at that time?

5    A.    Yes, sir.

6    Q.    How many law enforcement officers were present?

7    A.    Just two.

8    Q.    Yourself and one of the task force officers?

9    A.    That's correct.

10   Q.    And you met Mr. James at his home?

11   A.    I did.

12   Q.    Were his parents at the home at the time?

13   A.    They were not.

14   Q.    He was there alone?

15   A.    Correct.

16   Q.    Would it be fair for me to say that he was cooperative

17   when you interviewed him?

18   A.    Yes.

19   Q.    That he wasn't trying to be evasive?

20   A.    I wouldn't say that.

21   Q.    Well, I mean, he was concerned that the FBI showed up

22   at his house, correct?

23   A.    Yeah.

24   Q.    Was this a situation where you felt it necessary to

25   Mirandize him, or you did not Mirandize him because he

1    wasn't in custody?

2    A.    He was free to leave and free to stop the interview at

3    any time.  So no Miranda was needed.

4    Q.    There was no formal Miranda warning at the time?

5    A.    No.

6    Q.    But he knew you were FBI and that the other officer

7    was a task force officer with the FBI?

8    A.    Correct.

9    Q.    You told him that you were there to talk to him about

10   something that happened online?

11   A.    Correct.

12   Q.    And you explained to him basically what we learned

13   about in Government's Exhibit 1?

14   A.    Sorry, which was?

15   Q.    The chat between the undercover and Ambient_Sun?

16   A.    Correct.  We didn't go into detail, but that was the

17   nature of the interview.

18   Q.    And Mr. James was cooperative and didn't deny that he

19   was Ambient_Sun or anything like that?

20   A.    He stated that he didn't recall the specific

21   conversation.

22   Q.    Okay.  But he didn't deny it either?

23   A.    Correct.

24   Q.    Okay.  And at that time you assessed the situation and

25   you left?

1    A.    At that time his --

2    Q.    Strike that.  Let me back up a little.

3          You did further investigation, correct?

4    A.    After we left, correct.

5    Q.    Okay.  But he also, while you were there, he gave you

6    access to his phone?

7    A.    That's correct.

8    Q.    He gave you permission to look at his phone, correct?

9    A.    Correct.

10   Q.    And did you have like a mobile, like forensic unit

11   that could look at his phone in more detail?

12   A.    On scene?

13   Q.    On scene.

14   A.    No.

15   Q.    Okay.  Did you have any tools that you were able to

16   use to look at his phone in greater detail?

17   A.    No, not when we were at his property.

18   Q.    Okay.  It says in the affidavit that you noticed on

19   the property that there was child exploitive materials on

20   his phone?

21   A.    Correct.  We asked him about the applications that he

22   was using to access that material.  He showed us those

23   applications.

24         And then on those applications we could view what

25   appeared to be child sexual abuse material.

1    Q.    But you weren't able to count it or anything at that

2    time?

3    A.    No.  We confirmed that there was material on there.

4    And then due to the fact that we didn't have a forensics

5    team and it takes a long time to image a phone, we had

6    consent to take that phone and image it.

7    Q.    Okay.  So without a warrant, he gave you consent to

8    take his phone?

9    A.    That's correct.

10   Q.    Okay.  And you took his phone and went back to the

11   office?

12   A.    Correct.  The phone was taken back and imaged.

13   Q.    Okay.  And so you got a -- you did forensics on it and

14   got an image from the phone, basically a copy of what was on

15   the phone?

16   A.    Correct.

17   Q.    So that you could examine it for forensic purposes?

18   A.    That's correct.

19   Q.    Okay.  The phone wasn't returned, I presume?

20   A.    No.

21   Q.    That's because it contained contraband on it?

22   A.    Correct.

23   Q.    So you continue to possess the phone until -- I guess

24   you still have the phone?

25   A.    Correct.  Once the image is done, it's generally, the

1   phone itself is sent to evidence where it sits.

2   Q.   So it's sitting in your evidence locker somewhere?

3   A.   Correct.

4   Q.   And so then you did do a complete forensic examination

5   of the phone?

6   A.   One was done, yes.

7   Q.   One was done.  And then that's where we come up with

8   the 700-and-some images of CSAM?

9   A.   Files, correct.

10   Q.   Files of CSAM.  And some of those are pictures and

11   some of those are videos?

12   A.   Correct.

13   Q.   Did you find the chats from Whisper?

14   A.   Are you asking if the chats were on the phone?

15   Q.   Were the chats on the phone, yes.

16   A.   I did not review that particular device, so I can't

17   say.

18   Q.   Okay.  Were there other devices that were ultimately

19   taken from --

20   A.   No, there was just the one device, but that initial

21   review is done by our task force officer.

22   Q.   Okay.  So ultimately -- so this is in early July,

23   correct?

24   A.   Correct.

25   Q.   So ultimately you decided to swear out a criminal

1   complaint and then arrest Mr. James, correct?

2   A.   Correct.

3   Q.   And that occurred earlier this week?

4   A.   Correct.

5   Q.   So this interview occurred on July 1?

6   A.   Um-hum.

7   Q.   And then the decision to arrest Mr. James occurred

8   earlier this week?

9   A.   No.

10   Q.   When was the decision made to get an arrest warrant

11   for Mr. James?

12   A.   Well, the decision to want to arrest Mr. James was on

13   July 1, but unfortunately there is a process that has to be

14   taken in order to do that.

15   Q.   You didn't -- just based upon what Mr. James admitted

16   to at that time and also the fact that you saw that he had

17   child pornography on his phone, are you saying you didn't

18   have the authority to arrest him at that time?

19   A.   I don't think it's good practice to, without giving

20   the due diligence to completely review his material, to make

21   that determination.

22   Q.   Okay. But if you were concerned about the safety of

23   the community, you had the authority to arrest Mr. James on

24   July 1, correct?

25   A.   We do have that authority, yes.

1  Q.    And you could have sworn out a complaint just based

2  upon that information that you had at that time, correct?

3  A.    We could have typed one.

4  Q.    Right.  And he could have had an initial appearance in

5  court on around July 2 based upon the criminal complaint?

6  A.    We could type up the information we have as

7  investigators, but we don't make the ultimate determination

8  as to whether or not --

9  Q.    That would be the United States Attorney's Office,

10  correct?

11  A.    That's correct.

12  Q.    So you'd have to interact with the U.S. attorney in

13  the case?

14  A.    That's correct.

15  Q.    But if law enforcement had a concern that somebody was

16  an imminent threat to the community, they wouldn't have let

17  him remain in the community.  They would arrest him,

18  correct?

19  A.    Presumably.

20  Q.    So there was something about your interactions with

21  Mr. James that you didn't feel that it was important to

22  arrest him immediately on July 1, correct?

23  A.    Um --

24  Q.    Well, you didn't arrest him on July 1, correct?

25  A.    That's correct.

1   Q.   You had the authority to arrest him on July 1,

2   correct?

3   A.   Yes, sir.

4   Q.   You had the authority to arrest him at any time

5   between July 1 to September 3, correct?

6   A.   Correct.

7   Q.   And he wasn't arrested until September 3?

8   A.   Correct.

9   Q.   So when he was arrested, again, Mr. James, would you

10  characterize his demeanor with you as cooperative?

11  A.   He was.

12  Q.   Do you remember him telling you that you didn't have

13  to even come get him, that he would have came and turned

14  himself in if you'd just called him up and said there was a

15  warrant for him?

16  A.   He did say that.

17  Q.   So he didn't appear to be anyone who wanted to flee?

18  Or he didn't show any evidence of a propensity to be fleeing

19  at that time?

20  A.   Not at that time.

21  Q.   And then I assume now since he was under arrest when

22  you interviewed him the second time, you advised him of his

23  rights?

24  A.   We did.

25  Q.   Okay.  And he waived his rights and agreed to talk to

1    you without an attorney?

2    A.    That's correct.

3    Q.    And it was during this back and forth that he admitted

4    to you that he had at least communicated with people online

5    who purported themselves to be minors, correct?

6    A.    Correct.

7    Q.    But he never met with any of those people in person,

8    correct?

9    A.    I don't know.

10   Q.    Well, he never told you he met with any of those

11   people in person, correct?

12   A.    That's what he said.

13   Q.    And your investigation has not determined that he has

14   met with anybody in person, correct?

15   A.    Correct.

16   Q.    Okay.  And again, now, you've had his phone for quite

17   some time.  Have you been able to find chat logs between Mr.

18   James and other individuals?

19   A.    From my understanding, there were additional chat

20   logs, but some were -- had been removed since we seized the

21   phone.

22   Q.    Okay.  But when you forensically examine a phone, you

23   have the ability to recover information that's been deleted?

24   A.    Certain information is saved to the phone, but on

25   applications like that, especially if they're cloud based,

1  then no.

2  Q.   Okay.  So you didn't have sufficient evidence to try

3  to find any of the persons that he may have chatted with?

4  A.   The investigation is ongoing.

5  Q.   So the investigation is ongoing.

6      All right.  So you have no evidence that Mr. James

7  actually met with anyone in person, correct?

8  A.   No.

9  Q.   And according to him, he said he never met with anyone

10  in person, correct?

11  A.   Correct.

12  Q.   And, but you also said that he made statements to the

13  effect, "Well, gee, if you guys didn't get me, you know I

14  probably could have met with someone or was close to meeting

15  with someone," right?

16  A.   He said that if we didn't meet with -- if we didn't

17  make contact with him, he probably would have met with

18  somebody.

19  Q.   And that was him in basically cooperation mode with

20  the FBI, correct?

21  A.   Correct.

22  Q.   Is this interview audiotaped and videotaped in any

23  way?

24  A.   Audio and video.

25  Q.   There is audio and video of this interview.

1          All right.  Thank you.

2          You said that during this he admitted to having chats

3     with other minors or people portraying themselves as minors,

4     you said two to ten times?

5     A.    That was what Mr. James stated.

6     Q.    Okay.  Would you agree with me there is a big

7     difference between two and ten?

8     A.    No.

9     Q.    Okay.  So you don't think that's a wide variation?

10    A.    No.

11    Q.    And other stuff that you found on the phone involved

12    these pictures of coworkers because apparently he used to

13    work at a McDonald's?

14    A.    I believe he still does -- or excuse me.

15    Q.    He works at Taco Bell.

16    A.    Taco Bell.

17          Yes, Mr. James stated he used to work at McDonald's.

18    Q.    Okay.  You said they were coworkers.  Female

19    coworkers?

20    A.    Correct.

21    Q.    You indicated that he used AI to undress them?

22    A.    Correct.

23    Q.    As inappropriate as that sounds, that's not unlawful,

24    correct?

25    A.    It is unlawful.

1    Q.    It is unlawful now?

2    A.    Depending on the age of the individuals.

3    Q.    Okay.  All right.  So the individuals were female

4    workers at McDonald's?

5    A.    Correct.

6    Q.    Did you identify the workers themselves?

7    A.    At the time -- at this time, no.  The investigation is

8    still ongoing.

9    Q.    And so some of them maybe appeared to be underage or

10   teenagers?

11   A.    He stated that they were minors.

12   Q.    He stated that they were minors, okay.

13         But if they were working at McDonald's, they weren't

14   eleven or twelve years old, correct?

15   A.    Not -- likely not eleven or twelve.

16   Q.    They were likely sixteen or older?

17   A.    If they were minors, I would say sixteen to seventeen.

18   Q.    And he also explained to you how he was able to gain

19   access to the CSAM material, too, correct?

20   A.    Correct.

21   Q.    And it was through these same apps, Telegram and

22   Whisper?

23   A.    Correct.

24   Q.    And these are applications that are allowed to be in

25   service online as we speak today?

1    A.    Unfortunately.

2    Q.    So they're not -- they haven't been taken down or

3    anything like that?

4    A.    No.

5    Q.    I guess, wasn't the creator of Telegram arrested in

6    France or something recently?

7    A.    Probably.

8    Q.    But again, the apps themselves aren't considered

9    contraband or illegal themselves?

10   A.    No.

11   Q.    In these images, you described adults having sex with

12   prepubescent minors.  And you also said -- you described

13   adults having sexual conduct with what appeared to be

14   infants?

15   A.    Correct.

16   Q.    And that was within this 749 images?

17   A.    Within the 764, correct.

18   Q.    The 764.

19         And those images varied from the infants to

20   adult -- well, I guess if it's CSAM is all minor related.

21   A.    Correct.  I mean -- excuse me.  Of the 764 files, all

22   of those would be consistent -- or excuse me, considered

23   child sexual abuse material.

24   Q.    All right.  So anyone under eighteen?

25   A.    Correct.

1          MR. BRYAN:  Nothing further, Your Honor.

2          THE COURT:  Thank you.

3       Redirect?

4          MS. SCHNELLINGER:  Just briefly, Your Honor.

5          REDIRECT EXAMINATION OF AUSTIN JOHNSTON

6    BY MS. SCHNELLINGER:

7    Q.    Based on the chats and your experience and training,

8    who did the defendant believe he was talking to when he was

9    talking to an online covert employee in June?

10   A.    A eleven-year-old female.

11   Q.    And he sent that eleven-year-old female pictures of

12   his penis?

13   A.    Correct.

14   Q.    And he admitted that he has done that before when he

15   was talking to minors?

16   A.    Correct.

17   Q.    And he specifically stated to you that he would have

18   met with the child to do the things that he described in the

19   chats if you hadn't intervened?

20   A.    Correct.

21          MS. SCHNELLINGER:  Nothing further, Your Honor.

22   Thank you.

23          THE COURT:  All right.

24       Any recross?

25          MR. BRYAN:  No, Your Honor.  Thank you.

1          THE COURT:  Thank you very much, Special Agent

2     Johnston.  You're excused.

3          (Witness excused.)

4          THE COURT:  Ms. Schnellinger, is there any

5     further evidence or proffer from the government?

6          MS. SCHNELLINGER:  No, Your Honor.  Thank you.

7          THE COURT:  All right.  Thank you.

8       Mr. Bryan.

9          MR. BRYAN:  Your Honor, we, too, would proffer

10    the pretrial services report.

11         And I would also proffer for the record that present

12    in court today is Heather James, Mr. James' mother, that I

13    spoke with her prior to the proceedings today and she

14    indicated, as is I think made clear in the pretrial services

15    report, that Mr. James is permitted to live in his home with

16    whatever conditions -- or in her home and her husband's

17    home, with whatever conditions the Court deems appropriate

18    during the pendency of this matter.  So he does have a

19    stable residence to stay at with the permission of his

20    parents.

21         THE COURT:  Thank you.

22         All right.  I know that our pretrial services officers

23    work under strict time pressures, and so I always do like to

24    check in before we move to argument to see if there is any

25    further information or recommendations from pretrial

1    services.

2          THE PRETRIAL SERVICES OFFICER:  No, Your Honor.

3    Nothing further.

4          THE COURT:  Thank you.

5          All right.  The Court is now prepared to hear argument

6    from the parties which should specifically address the

7    detention factors under 18 U.S.C. 3142(g).

8          Ms. Schnellinger, you may proceed with argument.

9          MS. SCHNELLINGER:  Thank you, Your Honor.

10         I think this Court has a decent idea of the nature and

11   circumstances of this specific offense.

12         I will highlight the fact that this is a very

13   vulnerable community that he is targeting, specifically

14   children as young as eight years old.  Not to mention the

15   fact that the child sex abuse material that was recovered

16   involved infants and involved sadistic child sex abuse

17   material as well.

18         So we have not only the victimization of the children

19   that are involved in the child sex abuse material but also

20   his activities online.

21         He, in the chats that we have and that I presented to

22   the Court, he was -- believed that he was talking to an

23   eleven-year-old girl.  He was not under any delusion that it

24   wasn't.

25         And he also admitted that he has done this before and

1   that these were minors.

2       We don't have any indication that these were all

3   undercover officers.  We have one undercover officer.  And

4   all the rest were minors based on his own statement.

5       And again, his target group was eight years old, and

6   older, and that he would ask these minors for nude photos of

7   themselves.

8       I think most importantly to point out the nature and

9   circumstances of this case is that he specifically stated he

10  was escalating.

11      He started with conversations, and he didn't meet with

12  anybody but he fully admitted that he was escalating to the

13  point that he was going to attempt to meet with a child and

14  victimize our most vulnerable members of our society.

15      And he's described what he would do to that child in

16  Government's Exhibit 1.

17      I think the weight of the evidence for detention is

18  great.  Again, he did this in his parents' home.  He not

19  only victimized children while he was online, he reached out

20  to children even when he was working.

21      I realize that he took normal pictures of minors, but

22  then he victimized them in his own home by turning them into

23  nude pictures of these same individuals and then using them

24  for his own sexual gratification.

25      So even children in the community that are just

1    working, he made them victims.

2         So you add all that together, I think the weight of

3    the evidence is great.

4         I recognize that he has a stable residence with his

5    parents and that he is employed.  But again, all this

6    happened when he was in that stable residence.  All this

7    happened when his parents were present.  And some of this

8    happened when he was employed.  So I think that the history

9    and characteristics, which may be positive in some cases,

10   are negative in this case.

11        And I will point out that it seems like his mom, based

12   on the pretrial services report, was unaware of a lot of the

13   things that were going on with this particular defendant, if

14   you read through the mental health assessment and obviously

15   his activities.

16        I think overall, Your Honor, that the main factor to

17   focus on is the nature and circumstances and the

18   vulnerability of the victims in this case.

19        He did this in his own home.  He did this with his

20   parents -- living with his parents.  And I don't know what

21   conditions this Court could put in place.

22        I realize that the Court can put a bracelet on him or

23   monitor him and make sure he's not on the computer.  But he

24   was using legal applications to do this.  He was utilizing

25   victims that were just in the community working.  And he was

1   able to victimize them, and they were unaware of this.

2       So I don't know how the Court could put any restraints

3   on him in the community that can prevent this individual

4   from finding an eight-year-old child. And that danger is so

5   great to that vulnerable, as I keep saying, that vulnerable

6   member of our community.

7       If he decides to just walk out the door, we're not

8   going to be able to stop him. And I think the danger that

9   he poses is too great to release him.

10      Thank you.

11          THE COURT: Thank you.

12      Mr. Bryan.

13          MR. BRYAN: Yes, Your Honor.

14       As it relates to the issue of detention, the Court has

15   to determine, first of all, whether or not the presumption

16   in favor of detention has been rebutted.

17       I would submit to the Court that the pretrial services

18   report itself presents significant evidence to rebut the

19   presumption in favor of detention.

20       In addition to that, the proffer regarding his

21   mother's willingness along with his father, who couldn't be

22   here today, to allow him to remain in their home and stay in

23   their home with whatever conditions the Court deems

24   appropriate would also rebut the presumption in favor of

25   detention.

1    So then the issue then becomes whether or not, by the

2    weight of the evidence, whether or not Mr. James is a flight

3    risk, or by clear and convincing evidence whether he is a

4    danger to the community.

5        I don't know that the government is arguing flight

6    risk.  I believe that the government's stronger argument, or

7    the one that they're emphasizing more -- I'm not suggesting

8    that I believe their argument for danger is stronger, but

9    the one they seem to be emphasizing is as it relates to

10   danger to the community.

11       The government seems to believe that there aren't any

12   conditions sufficient to be able to warrant the Court's

13   peace of mind that Mr. James would not engage in the types

14   of conduct that appear to be taking place based upon the

15   allegations in this case.

16       I think it is important to point out that there is no

17   evidence that Mr. James actually met with anyone in person.

18   And that is because of the nature of the internet, that a

19   lot of things take place out of the privacy of people's

20   homes that they would never do or never act upon outside of

21   their home, meaning they can, while they're sitting at home

22   in their own bedroom, while they're chatting with somebody

23   online, they can act like anything, frankly, that they want

24   to be.  No matter how horrific it may sound, they can act

25   that way.  They can speak that way.  But there is no

1   evidence whatsoever that Mr. James would have ever acted the

2   way that the Government's Exhibit 1 indicates.

3       So that's why I brought up fantasy role-playing as it

4   relates to how people may engage online as compared to in

5   real life.

6       And I think it is important, the nature and quality of

7   the investigation is important.  If you target -- if you see

8   someone like this and you have a concern about someone like

9   this, I'm not sure why law enforcement didn't play it out,

10  why they didn't continue to communicate with Ambient_Sun

11  over the internet and eventually set up a meet a date and

12  time.

13      I've represented multiple people throughout my last 27

14  years in federal court who came into court the morning after

15  they were arrested by the task force because they showed up

16  somewhere.  They came from across state lines and they

17  showed up in a hotel where they thought they were going meet

18  a minor.  Or they showed up at a residence where they

19  thought they were going to meet a minor.

20      And law enforcement carried out the hoax, the

21  undercover activity, up until the point where they could see

22  whether or not this person was just engaging in all talk

23  online or fantasy role-play online, or if they really were

24  somebody who is an actual threat to carry out the types of

25  things that they were -- that they would say online but

1    would never do in real life.

2         And those clients, frankly, were arrested in very

3    compromising situations.  Some of them had brought gifts to

4    the children that they believed that they were going to

5    meet, the children that they had a series of chats with over

6    a period of time, with that person that was not a real child

7    but was an undercover law enforcement officer.  Sometimes

8    they acted as the mother of the child that they -- the

9    mother was trying to sell the child for sex and things of

10   that nature.  Sometimes they acted as the child themselves.

11        And those things were carried out to fruition so they

12   could really remove someone from the street who was really a

13   threat and danger to the community, someone who really was

14   going to act upon something rather than just engage in

15   fantasy.

16        And so what I think the evidence suggests at most in

17   this case -- and I don't think you can sort of jump to

18   conclusions above and beyond that -- what the evidence

19   suggests at most in this case is somebody who is engaging in

20   fantasy and not somebody who was intending to carry out in

21   real life interactions with children because there is zero

22   evidence that Mr. James did engage in activity with

23   children.  And I believe there is zero evidence that he

24   would have.

25        I think all the evidence suggests is that he was

1  somebody who was engaging in clearly not only inappropriate

2  behavior but the allegations being very concerning behavior

3  over the internet.

4      So, but does that mean that with the conditions and

5  combinations of conditions that this Court can impose, that

6  he continues to be a threat to the community?  I would

7  submit to the Court that it doesn't.

8      I think it's also relevant that law enforcement had

9  the authority to arrest Mr. James on July 2.  And I'm not

10  just talking about the FBI and the local task force.

11  However, they work in concert with the U.S. Attorney's

12  Office.  The U.S. attorney is now saying, "This is horrible.

13  He's is going to do this.  He's going to carry this out."

14      But for over two months nobody acted with any alacrity

15  whatsoever to arrest Mr. James and make sure that he didn't

16  really act on any of this stuff.

17      And I think they did that.  I think they made an

18  assessment, I think law enforcement made an assessment when

19  they met with Mr. James, probably because of his cooperative

20  nature and his -- and also looking at his background, that

21  he had emotional issues and was struggling with a lot of

22  mental health issues, that he wasn't a true threat to the

23  community.  And so that's why they didn't act immediately.

24      If they believed he was a threat to the community on

25  July 2 and they have this chat log on July 2, they would

1   have arrested him then and there.

2        I don't believe the FBI or the U.S. Attorney's Office

3   would allow someone to remain in the community for another

4   two months if they really believed that they were a threat,

5   a real threat to the community, as compared to somebody who

6   is engaged in, allegedly engaged in fantasy behavior as

7   compared to actually going and carrying it out.

8        And I believe that's why pretrial services makes the

9   recommendation it does, because they had an opportunity to

10  not only meet with Mr. James but also meet with his parents

11  and discuss Mr. James with his parents.

12       He's clearly been struggling since he went to college

13  and had some emotional -- he had an emotional breakdown.

14  There was an attempted suicide attempt with medication.

15  He's been in mental health treatment.

16       All of these are things that he and his family have

17  done on their own.  They weren't forced to do it by any

18  court.  So they're acting responsibly.

19       There is a young man that's struggling emotionally,

20  that's struggling with his mental health, and they're acting

21  responsibly.  He's getting the mental health treatment that

22  he needs in the community.  And he's continuing with that.

23  To this day he continues to see mental health professionals

24  even without it being a condition from the Court, which

25  obviously this Court can make it a condition.

1          But to this day, he and his family began long before

2     this case began intervening in his life with mental health

3     professionals.  And he has continued to meet with mental

4     health professionals to this very day.

5          So there is a stability there that I think the Court

6     can look to see also that there is not clear and convincing

7     evidence that this particular defendant, notwithstanding the

8     serious sounding nature of these chat logs, that he is a

9     true threat, a real threat to the community, especially with

10    the conditions that Your Honor can impose and that are

11    recommended by the pretrial services office.

12          Thank you.

13               THE COURT:   Thank you.

14          Mr. James, as I previously stated, the issues for

15    determination today are first whether you have met your

16    burden of production to rebut the presumption under 18

17    U.S.C. 3142(e)(3) that no condition or combination of

18    conditions will reasonably assure the appearance of the

19    person as required and the safety of the community, and if

20    you have met your burden, whether there is a condition or a

21    combination of conditions that will reasonably assure the

22    safety of others and the community and your appearance in

23    the case.

24          To sustain detention, the government must establish

25    either by clear and convincing evidence that no condition or

1  combination of conditions will reasonably assure the safety

2  of other persons and the community or by a preponderance of

3  the evidence that no condition or combination of conditions

4  will reasonably assure your appearance.

5       In determining whether there are conditions of release

6  that will reasonably assure your appearance as required and

7  the safety of others and the community, the Court must take

8  into account the available information regarding the

9  following factors:

10      First, the Court must consider the nature and the

11  circumstances of the offense charged, including whether that

12  offense involves minors.

13      Second, the Court must consider the weight of the

14  evidence against the defendant.  Now, that is the weight of

15  the evidence as to dangerousness or risk of flight.  Not the

16  weight of the evidence as to guilt.

17      The third factor is the history and characteristics of

18  the defendant.  That includes the character, physical and

19  mental condition, family ties, employment, financial

20  resources, length of residence in the community, community

21  ties, past conduct, history relating to drug or alcohol

22  abuse, criminal history, and the record concerning

23  appearances at prior court proceedings.

24      The Court must consider also whether at the time of

25  the current offense or arrest the defendant was on

1  probation, parole, or any other form of release.

2          The final factor is the nature and the seriousness of

3  the danger to any person or the community that would be

4  posed by the person's release.

5          As I indicated earlier, at no time do any of these

6  factors affect the presumption of innocence that applies in

7  all criminal cases.

8          The Court will take the detention determination under

9  advisement and will promptly issue a written ruling.

10          Mr. James will remain in the custody of the United

11  States marshal pending the Court's decision in the matter.

12          At this time, Ms. Schnellinger, is there anything

13  further on behalf of the United States?

14                  MS. SCHNELLINGER:  No, Your Honor.  Thank you.

15                  THE COURT:  Mr. Bryan, anything further for the

16  defense?

17                  MR. BRYAN:  No.  Thank you, Your Honor.

18                  THE COURT:  All right.  Thank you, all.  We're

19  adjourned.

20          (Proceedings concluded at 12:34 p.m.)

21

22

23

24

25

I N D E X

DIRECT EXAMINATION OF AUSTIN JOHNSTON          7

BY MS. SCHNELLINGER

CROSS-EXAMINATION OF AUSTIN JOHNSTON          16

BY MR. BRYAN

REDIRECT EXAMINATION OF AUSTIN JOHNSTON        36

BY MS. SCHNELLINGER

C E R T I F I C A T E


I certify that the forgoing is a correct transcript, to the best of my ability, transcribed from a digital audio recording from the record of proceedings in the above-entitled matter.


S/Caroline Mahnke               12/6/2024

Caroline Mahnke, RMR, CRR, CRC     Date